UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,   CRIMINAL NO. 15-20217

    Plaintiff,

v.   HON. STEPHEN J. MURPHY, III

BRYAN WATSON,
also known as "Bullet,"

    Defendant.
_____

**GOVERNMENT'S COMBINED RESPONSE
AND BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDICIAL RECOMMENDATION FOR MAXIMUM
RRC/HALFWAY HOUSE PLACEMENT**
_____

NOW COMES Plaintiff United States of America, by and through Dawn N. Ison, United States Attorney, and J. Michael Buckley, Assistant United States Attorney, both for the Eastern District of Michigan, Southern Division, who submit the following Response to Petitioner Watson's Motion for Judicial Recommendation for Maximum RRC/Halfway House Placement as follows:

## Table of Contents

Table of Authorities ................................................................................................... ii
I.    INTRODUCTION ........................................................................................... 1
II.   STATEMENT OF FACTS .............................................................................. 3
III.  PROCEDURAL HISTORY............................................................................. 9
IV.   ARGUMENT
      GIVEN THE SERIOUS NATURE OF HIS CRIMES, HIS POSTURE THROUGHOUT
      THIS CASE, AND THE VERY REAL NEED TO PROMOTE RESPECT FOR THE
      LAW, WATSON DOES NOT DESERVE THE SPECIAL CONSIDERATION OF
      EARLY RELEASE TO AN RRC OR HALFWAY HOUSE........................................... 13
IV.   CONCLUSION............................................................................................... 17

## Table of Authorities

**Statutes**

18 U.S.C. § 1951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

I.  INTRODUCTION

Watson and Hansberry, while Detroit Police officers assigned to the Narcotics Section, agreed to, and did, steal illegal drugs and drug monies from drug dealers in Detroit, for their own personal profit. The defendants pocketed and failed to report hundreds of thousands of dollars in stolen drug proceeds, and had third parties (drug dealers themselves) sell the stolen drugs and return a portion of the profits from the drug sales to the defendants.

To further this illegal conspiracy, the evidence proved that Watson and Hansberry prepared falsified police reports (which under-reported or willfully failed to report any seized drug proceeds), employed fake search warrants, and placed on evidence substituted sham kilograms of cocaine for actual, seized drugs. The defendants also willfully failed to arrest drug dealers they encountered during search warrant executions, and recruited them to work for defendants by supplying information on other drug dealers, so that defendants could steal and share illegal drugs and drug money.

In so doing, Watson disgraced his badge and he betrayed not only his sworn oath of office, but he betrayed the very citizens he was sworn to protect; he also betrayed all honest law enforcement officers and the criminal justice system. Instead of removing kilograms of cocaine –and more importantly, kilo weight

dealers- from the street, Watson worked in concert with kilo weight dealers to sell kilos of cocaine in Detroit.

The evidence at trial proved that with some of this drug money, Watson purchased a Mercedes Benz, and spent, on average, $31,000 more than he earned between 2010 and 2014. (ECF No. 231, PageID.6071–6073; ECF No. 262, PageID.7038). Watson only earned about $40,000 a year after taxes. (ECF No. 262-38, PageID.7039–7044). Yet he spent $71,992.98 on rent, $29,499.59 on cars, $22,790.22 on travel, and $18,333.65 on AT&T services between 2010 and 2014. (ECF No. 231, PageID.6069; ECF No. 262-39, PageID.7049). Watson also spent exorbitant amounts at retail stores; he somehow spent $66,086.47 during this five-year period at stores like Nordstrom, Louis Vuitton, Neiman Marcus, and Christian Louboutin. (ECF No. 231, PageID.6069; ECF No. 262-39, PageID.7049). Watson also purchased three houses from a cooperating drug dealer named Arthur Knuckles. (ECF No. 196, PageID.2489).

In other words, Watson supported his lavish lifestyle with unexplained sources of cash. (ECF No. 231, PageID.6058–6059; 6073). Between 2010 and 2014, Watson somehow deposited $220,878.29 in cash over this period. (ECF No. 231, PageID.6069–6071; ECF No. 262-37, PageID.7038; ECF No.262-39, PageID. 7046–7049).

## II.     STATEMENT OF FACTS

The evidence adduced at trial proved the following:

Gary Jackson ran a truck wash on the east side of Detroit. (ECF No. 230: PageID.5711). By all appearances, it was a legitimate business, but Jackson was a drug dealer who used it as a front to traffic illegal drugs. (*Id.*). In July 2010, a Mexican cartel used the truck wash to unload 100 kilograms of cocaine shipped to Detroit for local distribution. (*Id.* at 5712–13). The cocaine generated $3 million and the cartel planned to use Jackson's truck wash to load the money into a semi-truck to haul back to Mexico. (*Id.* at 5714).

Jackson double-crossed them. He learned about an official Detroit police program that rewarded tips that led to drug or money seizures with a monetary reward. (*Id.* at 5714–15). A childhood friend (and fellow drug dealer), Calvin Turner, had learned of this program from Detroit Police Officer Arthur Leavells. Turner knew Jackson was also involved in drug trafficking, so he mentioned it to him. (ECF No. 224, PageID.4649–4650 (Turner); ECF No. 230, PageID.5715 (Jackson)). Turner introduced Jackson to Leavells; Watson was also present for the introduction. (ECF No. 230, PageID.5715–5716). Watson told Jackson that he would get roughly $800,000—$500,000 officially from the Detroit police department and $300,000 "off the top" of the money seized. (*Id.* at 5717). Jackson

3

agreed and told them the shipment would leave from his truck wash. (*Id.* at 5720 (Jackson); ECF No. 228, PageID.5440–5442 (Leavells)).

Weeks later, a truck came to take the money to Mexico. (ECF No. 230, PageID.5721). The local members of the cartel brought the money to Jackson's truck wash and loaded $3 million in drug proceeds into the cab of the semi-truck. (*Id.* at 5721–22). The money was separated into small packages in gym bags; each package was wrapped in newspaper and again in plastic with a number written on it. (ECF No. 228, PageID.5450–5453; ECF No. 262-20–262-28, PageID.6934–6942). Jackson called to tell Leavells that the shipment would leave soon. (ECF No. 228, PageID.5444–5445 (Leavells); ECF No. 230, PageID.5722–5723 (Jackson)).

Police stopped the truck after it left the truck wash. (ECF No. 228, PageID. 5445). Hansberry, Watson, and other members of their narcotics raid unit participated in the stop. (*Id.* at 5445). Leavells arrived after they had started removing the money, and he called Jackson to report the seizure. (ECF No. 230, PageID.5724–5725). Leavells passed along a message from Watson: "we sweet." (*Id.* at 5725). News spread quickly, and people from the Detroit police department, DEA, and FBI came to join in the excitement. (ECF No. 228, PageID.5447–5448). Jackson went to a hotel by the airport and waited for the promised $300,000 off the

top. (ECF No. 230, PageID.5725). But Watson called to report they didn't have a chance to keep any of the money because senior officers arrived on the scene too quickly. (*Id.* at 5726). Jackson was furious, but he got even more upset after the news reported that the police seizure was only $2.1 million during the stop. (*Id.* at 5726–27). Jackson felt cheated because he saw $3 million loaded into the truck. (*Id.*)

This discrepancy made Leavells suspicious too. He noticed that members of his narcotics unit who had arrived at the scene before him started to make large purchases. (ECF No. 228, PageID.5457–5458). Hansberry, for example, bought a new Chevrolet Corvette and an Aston Martin. (*Id.* at 5458). Watson bought a Mercedes and an Infiniti truck. (*Id.*). And another officer bought two vehicles, some property, and a new boat. (*Id.*).

Eventually, Jackson did receive $250,000 from the police department, as an official reward. (ECF No. 230, PageID.5728–5729). But that did not happen until after he met with the chief of the Detroit Police Department—a meeting arranged by Turner's cousin, NBA star Derrick Coleman—and complained that *he* provided the information that led to the seizure. (*Id.* at 5730–31). Jackson arranged to meet Hansberry, Watson, and Leavells at a hotel in Southfield on August 14, 2010, to collect the money. (*Id.* at 5728–30). Because he felt that he could not trust them

5

after their attempt to renege on their agreement, Jackson asked a cousin with the Wayne County Sheriff's Office to join him. (*Id.* at 5729, 5735). The officers also brought someone—an officer from Property who counted the money (using a money counter) and officially turned it over to Jackson. (*Id.* at 5735–41). Jackson signed a receipt for the $250,000, and his cousin and the employee from Property left. (*Id.* at 5742–43).

Hansberry, Watson, and Leavells remained behind to talk with Jackson alone. (*Id.* at 5743). Unbeknownst to them, Jackson recorded the conversation with a device he bought at a novelty spy shop. (*Id.* at 5736; ECF No. 262-19, PageID. 6902–6933). Jackson felt the officers had ripped him off for hundreds of thousands of dollars, and he intended to keep the recording as proof should they try to cross him again. (ECF No. 230, PageID.5732).

Hansberry told Jackson that he did not have a problem paying him with money off the top of seizures in the future now that he knew Jackson was "the real deal." (*Id.* at 5745). Hansberry said that he "had to do it this way to make sure you wasn't the feds, to make sure you wasn't with the FBI, the DEA, setting me up." (*Id.*; ECF No. 262-19, PageID.6914). But going forward, Hansberry offered to pay Jackson with money from seizures "brown paper bag style," in addition to any legitimate payments from the police department on the back end. (ECF No. 230,

6

PageID.5745–5746; ECF No. 262-19, PageID. 6914–6915). Hansberry added that a smart, "well connected" guy like Jackson "could be a millionaire doing this," stressing "the money is where it's at." (ECF No. 230, PageID.5746, ECF No. 262-19, PageID.6915–6916). Hansberry repeated several times that he was "looking for the money seizure again," but left open the possibility of giving Jackson drugs seized by the narcotics unit to sell once they had established a closer relationship. (ECF No. 230, PageID.5749; ECF No. 262-19, PageID.6917, 6919-6920).

Hansberry and Watson each emphasized that the benefit in a working relationship was not just financial. Hansberry noted that Jackson could always "give up a dirty cop" and "get out of jail free" if he were arrested with drugs. (ECF No. 230, PageID.5746–5747; ECF No. 262-19, PageID.6916). Watson added that "We everybody's get out of jail free card." (ECF No. 230, PageID.5747; ECF No. 262-19, PageID.6916). When Jackson replied that he would need to continue to sell drugs and associate with other drug dealers to know about money or drugs to seize, Hansberry assured him that "it's all good" and Jackson should "do what you do." (ECF No. 230, PageID.5747; ECF No. 262-19, PageID.6916). So long as Jackson stayed in Detroit while "moving and shaking," Hansberry would "get [him] off his case" should he get arrested—"that's another benefit for working with us" beyond a share of any seizures. (ECF No. 230, PageID.5747; ECF No.

7

262-19, PageID.6916–6917). Jackson hesitated. He did not want to supply information that might lead to the arrest of black people in Detroit, but Hansberry explained that this offer also applied to anyone working with Jackson. (ECF No. 230, PageID.5750; ECF No. 262-19, PageID.6921–6923). Hansberry said that Jackson need only advise that "this is my guy don't do him" and the narcotics unit would take his drugs but would not "lock them up" or "put him in the court system." (ECF No. 230, PageID.5750–5751; ECF No. 262-19, PageID.6922–6923). Watson added that he "ain't never cared about putting a brother in jail." (ECF No. 262-19, PageID.6924). Hansberry and Watson had only one priority: money. (ECF No. 230, PageID.5752; ECF No. 262-19, PageID.6926–6927).

Before the conversation ended, Watson said he would teach Jackson how to make kilograms of "dummy" narcotics—packaged "drugs" that would test positive but were not real—so that they could pretend to arrest Jackson. (ECF No. 230, PageID.5753–5754; ECF No. 262-19, PageID.6932–6933). In other words, Jackson would tell them about a prospective drug sale, and the narcotics unit would "arrest" him and seize the fake drugs and the customer's money. (ECF No. 230, PageID.5753–5754; ECF No. 262-19, PageID.6932–6933). That way the customer would blame the police and not realize Jackson had set them up. (ECF No. 230, PageID.5753–5754; ECF No. 262-19, PageID. 6932–6933).

After that meeting, Jackson told Hansberry and Watson about drug deals in Detroit in exchange for a portion of the seizures. He also sold drugs given to him by Hansberry and Watson. (ECF No. 228, PageID.5469–5470 (Leavells); ECF No. 230, PageID.5757–5758 (Jackson)). Leavells was usually the intermediary. (ECF No. 228, PageID.5469–5470 (Leavells); ECF No. 230, PageID.5756–5758 (Jackson)). But Jackson often interacted with Hansberry and Watson too. The three (Hansberry, Watson, and Leavells) gave Jackson heroin to sell on one occasion, and Jackson gave them $50,000 of the proceeds after he sold it. (ECF No. 230, PageID.5757–5758).

### III.     PROCEDURAL HISTORY

Defendant Detroit Police officers Bryan Watson and David Hansberry were jointly charged in a superseding indictment with one count of Conspiracy to Commit Hobbs Act Extortion, in violation of 18 U.S.C. § 1951, one count of Conspiracy to Distribute Cocaine in violation of 21 U.S.C. § 846, one count of Possession With Intent to Distribution of Cocaine in violation of 21 U.S.C. § 841, and one count of Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c). Watson was charged in five of those Hobbs Act Extortion counts and Hansberry was charged in six. (ECF No. 79: Superseding Indictment).

Jury trial of this case commenced on June 7, 2016 and concluded five weeks later on July 11, 2016, when the jury returned a verdict of guilty, as charged, on Count One, Conspiracy to Commit Hobbs Act Extortion and not guilty on the remaining counts. (ECF No. 121, PageID.563-568).

On July 20, 2016, Watson filed a motion for judgement of acquittal. (ECF No. 126). The United States filed a response (ECF No. 135), and on August 16, 2016, this court entered an order denying Watson's motion. (ECF No. 139).

Watson was convicted of a very serious felony offense, which involved conspiring with violent, kilo-weight drug traffickers to distribute cocaine and heroin on the streets of Detroit, and to steal drug proceeds from criminals, for Watson's personal enrichment. To further his crime, Watson stole seized drugs and drug money, wrote and filed false police reports, replaced stolen kilos of cocaine with sham or "dummy" kilos which they placed on evidence, and prepared fake search warrants with a forged judge's signature. Worst of all, Watson and Hansberry willfully released kilo weight drug dealers whom they caught red-handed, to further their illegal enterprise and enrich themselves. Defendants made a mockery of the criminal justice system and further endangered Detroit neighborhoods.

The United States Probation Department conducted an investigation and

issued its Presentence Investigation Report ("PSR") on October 24, 2016. Notwithstanding the fact that the PSR did not take into account Watson's acquitted conduct, the Probation Department calculated Watson's Guideline range to be 121-151 months. The United States urged this Court to take into account Watson's acquitted conduct and sentence him accordingly. (ECF No. 165, Government Sentencing Memorandum).

Sentencing for Watson and Hansberry took place on February 22, 2017. (ECF No. 179, PageID.2034-2104). After a full and fair sentencing hearing, this Court found Watson to have an Offense Level 32, criminal history category I, with a guidelines range of 121-151 months; but the Court found that Watson had slightly lesser involvement than Hansberry, and varied downward two levels to an offense Level 30, criminal history category I and a resulting range of 97 to 121 months. (ECF No. 179, PageID.2096-2097). The Court then imposed upon Watson a sentence of, *inter alia*, 108 months' imprisonment. (ECF No. 179, PageID.2097).

On February 23, 2017, Watson filed a timely Notice of Appeal. (ECF No. 171). On June 13, 2019, in a lengthy unpublished opinion, the Sixth Circuit Court of Appeals affirmed Watson's conviction and sentence. (ECF No. 265).

On July 20, 2020, Watson filed a motion to reduce sentence (ECF No. 279). The United States filed a response on August 17, 2020 (ECF No. 281) and this Court

denied Watson's motion on September 10, 2020. (ECF No. 284).

On September 3, 2020 Watson filed a Motion pursuant to 28 U.S.C. § 2255, alleging four claims of ineffective assistance of counsel, a *Brady* violation, and claim of prosecutorial misconduct. (ECF No. 289). On March 16, 2021, Watson filed a motion to amend his Section 2255 motion, seeking resentencing based upon a claim that this Court failed to make a fact finding at sentencing concerning the amount that Watson stole from the seizure of the Mexican cartel drug proceeds. (ECF No. 323). On April 15, 2021, this Court ordered the United States to respond. (ECF No. 325).

On May 10, 2021, the United States filed its response to Watson's 2255 motion. (ECF No. 327). On June 23, 2021, this Court denied Watson's Section 2255 motion. (ECF No. 335).

On July 9, 2021, Watson filed a notice of appeal. (ECF No. 341). On February 23, 2022, the Sixth Circuit United States Court of appeals denied Watson a certificate of appealability. (ECF No. 357).

On June 8, 2022, Watson filed his instant motion for judicial recommendation for Maximum halfway house. (ECF No. 366). The United States opposes Watson's motion and states that given the horrendous nature of Watson's betrayal of his oath of office as a police officer, the need to promote respect for the law, for just punishment, and to deter others, Watson's motion should be denied.

## IV. ARGUMENT

GIVEN THE SERIOUS NATURE OF HIS CRIMES, HIS POSTURE THROUGHOUT THIS CASE, AND THE VERY REAL NEED TO PROMOTE RESPECT FOR THE LAW, WATSON DOES NOT DESERVE THE SPECIAL CONSIDERATION OF EARLY RELEASE TO AN RRC OR HALFWAY HOUSE.

Watson, a disgraced corrupt narcotics officer who turned his badge into a badge of shame, and who has served just over 57% of his 108-month sentence, is requesting of this Court special consideration, early release to a halfway house. (ECF No. 366). Watson, quite simply, is not deserving of this discretionary special consideration.

Watson has already received substantial breaks in this case. Firstly, although convicted of the most serious charged offense of conspiracy to commit extortion, he was acquitted on nine remaining substantive counts. The United States has always contended that this anomalous result was a compromise verdict, and urged this Court to hold Watson accountable for the acquitted conduct which was supported by the testimony of the victims of Watson's extortion. (ECF No. 165, Government Sentencing Memorandum).

Secondly, Watson received a substantial break at sentencing. This Court did not hold Watson accountable for the acquitted conduct and in fact varied downward and imposed a lower sentence upon Watson. This Court found Watson

13

to have an Offense Level 32, criminal history category I, with a guidelines range of 121-151 months; but the Court found that Watson had slightly lesser involvement than Hansberry, and varied downward two levels to an offense Level 30, criminal history category I and a resulting range of 97 to 121 months. (ECF No. 179, PageID.2096-97). The Court then imposed upon Watson a sentence of, *inter alia*, 108 months' imprisonment. (ECF No. 179, PageID.2097).

Watson's defense at trial and his position at sentencing, upon direct appeal, and during post-conviction motions including his 2255 motion, were all predicated upon his actual innocence of all charges. Watson's position resulted in a weeks-long jury trial, and hours of time and effort by this Court, jurors, witnesses, court staff and security, and attorneys. Watson's position also resulted in the scorching cross-examination of several prosecution cooperating witnesses whom defense counsel ridiculed and called liars.

Although the burden of proof in a criminal case rests entirely on the prosecution, Watson's position in court was disingenuous, because after trial, in 2019, he admitted to an FBI special agent that he had in fact committed the crimes of which he had been acquitted. This admission of guilt occurred after the trial but before claims of actual innocence, prosecutorial misconduct, and *Brady* violations in his 2255 motion. (ECF No. 289).

14

In his Section 2255 motion, Watson argued that his *Brady* claim should not be deemed procedurally defaulted because he claimed "actual innocence." (ECF. No. 289, Page ID.7381). However, in 2019, years after his conviction, Watson quietly admitted to the FBI his guilt of all of the crimes charged during an interview at his place of incarceration, Butner Federal Medical Center, barring his claim of actual innocence.

On August 7, 2019, during an interview that he himself requested, Watson admitted to FBI Special Agents that he had committed not only the crime of conviction, but acquitted counts as well, vindicating the superseding indictment... and all of the Government's cooperating witnesses whose credibility was savaged at trial by defense counsel.[1]

And although he continued to dispute the $3 million amount of the cartel seizure, Watson admitted that drug proceeds were stolen from that money seizure and that he received a portion of the stolen drug money.

Watson further admitted that at one point he had accumulated $350,000.00 from drug related rips. Watson also advised that the rips for which he and Hansberry were indicted only accounted for a portion of the illegal activity in

---

[1] Watson's admission of guilt to the acquitted counts further undermined his Section 2255 claim of ineffective assistance of counsel… his lawyer obtained acquittals on counts to which Watson has since admitted guilt.

15

which they were engaged. (See ECF No. 329, Exhibit 1, FBI 302 Report of Interview, filed under seal).

Watson was convicted of conspiring to commit extortion, and in furtherance of that conspiracy, he employed at least one false search warrant with a forged judicial signature, filed fraudulent police reports and placed sham kilos on evidence to replace stolen kilos. Watson then filed post-conviction motions alleging prosecutorial misconduct and Brady violations. Watson's actions were disingenuous, to say the least.

Given the extremely serious nature of Watson's illegal activity, the fraud he employed to further his crime, and the substantial breaks that he has already received, his early release to a halfway house is not deserved. To promote respect for the law and to deter others, his motion should be denied.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, this Honorable Court should deny Defendant Bryan Watson's Motion for Judicial Recommendation for Maximum RRC/Halfway House Placement without conducting a hearing thereon.

Respectfully submitted,

DAWN N. ISON
United States Attorney

Dated: June 14, 2022

s/J. MICHAEL BUCKLEY
Assistant United States Attorney
Deputy Chief, Branch Offices
101 First Street, Suite 200
Bay City, MI   48708
(989) 891-0361
Michael.buckley@usdoj.gov
P36167

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2022, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Steven Fishman, Attorney at Law.

s/J. MICHAEL BUCKLEY
Assistant United States Attorney
Deputy Chief, Branch Offices